# IN THE UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF OHIO
# WESTERN DIVISION AT DAYTON

| | | |
|---|---|---|
| KEVIN PETTIT, | : | |
| Plaintiff, | : | |
| | | Case No. 3:08cv00257 |
| vs. | : | |
| | | District Judge Walter Herbert Rice |
| MICHAEL J. ASTRUE, | : | Magistrate Judge Sharon L. Ovington |
| Commissioner of the Social | | |
| Security Administration, | : | |
| Defendant. | : | |

## REPORT AND RECOMMENDATIONS[1]

## I.   INTRODUCTION

In 2002 Plaintiff Kevin Pettit applied with the Social Security Administration for Disability Insurance Benefits (DIB) asserting that he could no longer work, beginning on December 15, 2001, because he was under a "disability" within the meaning of the Social Security Act. Plaintiff's applications were denied during the early stages of administration review, and he did not seek further review. (Tr. 36, 40).

On December 30, 2003, Plaintiff again filed a DIB application and also filed an application for Supplemental Security Income (SSI). In each application Plaintiff asserted that he could no longer work, beginning on October 21, 2003, because he was under a disability. (Tr. 65-67, 535-37). Plaintiff's applications were denied at all stages of administrative review including, most significantly, by the written decision of ALJ Daniel R. Shell, who concluded that Plaintiff was not under a "disability" and was therefore not eligible to receive DIB or SSI. (Tr. 15-25).

---

[1] Attached hereto is NOTICE to the parties regarding objections to this Report and Recommendations.

There is no dispute in the present case that the Court has jurisdiction to review ALJ Shell's decision. *See* 42 U.S.C. §§405(g), 1383(c)(3).

This case is before the Court upon Plaintiff's Statement of Errors (Doc. #9), the Commissioner's Memorandum in Opposition (Doc. #11), the administrative record, and the record as a whole.

Plaintiff seeks an Order either reversing the ALJ's decision and awarding benefits or, at a minimum, remanding this case to the Social Security Administration to correct certain errors.

The Commissioner seeks an Order affirming the ALJ's decision.

## II.   FACTUAL BACKGROUND

### A.   <u>Plaintiff and His Testimony</u>

On the date of Plaintiff's claimed disability onset, he was 45 years old, and was thus considered to be a "younger person" for social security purposes. *See* 20 C.F.R. §404.1563(c); 416.963(c).[2]

Plaintiff has a high school Graduate Equivalency Diploma plus training as a semi-truck driver. (Tr. 132). Over the years he worked primarily as a truck driver and a carpenter's helper. (Tr. 127, 141).

Plaintiff's claimed disability derives from his mental health difficulties. He has been diagnosed on different occasions with various disorders, including schizoaffective disorder (bipolar) (Tr. 198), psychotic disorder and personality disorder (Tr. 197, 211), and bipolar II disorder (Tr. 231).

Plaintiff testified during the ALJ's hearing that he could not work a full-time job because he gets "confused very, very easily" and has racing and delusional thoughts. (Tr.

---

[2] The remaining citations to the Regulations will identify only the pertinent DIB Regulations, with full knowledge of the corresponding SSI Regulations. *See Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007).

2

553). He further testified, "I take medications for those. I just feel I can't concentrate, keep, keep on one task." *Id*.

At the time of the ALJ's hearing in August 2006, Plaintiff had been in mental health treatment for three years. (Tr. 554). He saw a nurse practitioner, a case manager, and a counselor, Dr. Haley, who oversaw his treatment. (Tr. 554-55). He takes prescription medication (Abilify), which helps somewhat; he still has racing and delusional thoughts "but not as bad." *Id*.

Plaintiff explained that he was hospitalized at the Twin Valley Psychiatric Hospital in 2001, where he stayed for about one month. (Tr. 555). Since then he has been psychiatrically hospitalized on two other occasions, each lasting about one week. He had not been psychiatrically hospitalized since 2003. (Tr. 555-56).

Plaintiff lived with his sister. During a typical day he mostly stayed in his room, watching television or sleeping. He did the dishes using a dishwasher, and he sometimes swept the floor. (Tr. 557-58). He leaves the house only to go to appointments for mental health treatment. (Tr. 558). Plaintiff's sister needed to remind him to take a shower. (Tr. 559). He did not have any hobbies. He also had low energy with difficulty sleeping at night because he would wake up every 1 to 2 hours. His exact explanation of this was somewhat confused; he explained, "I have very vivid dreams that wake me up every, every two months, or every two year, two years, two hours." (Tr. 559).

### B. <u>Additional Evidence</u>

Plaintiff was admitted to the Twin Valley psychiatric facility on January 2, 2001. A discharge narrative summary notes, "he was referred here by the Crisis Service because of the fact that the patient is currently very unstable, with threatening behavior, and asking for help, yet there was no active involvement in any treatment program in this area, because he just got here from the [S]tate of Michigan while he was driving his semi.... The patient was considered to be in need of urgent psychiatric treatment...." (Tr. 197). He was diagnosed on admission with psychotic disorder and personality disorder.

3

(Tr. 197). The discharge summary continued, "According to the information available, the patient had one episode of psychotic break when he was 17, was treated at the State institution in Michigan, and after he made a nice recovery did not require any further treatment or re-admissions...." *Id.*

The course of Plaintiff's hospitalization was documented as follows:

> Because of his obvious symptoms of manic behaviors, with psychotic symptoms, we assume that his main problem must be Schizoaffective Disorder, Bipolar, Unspecified, which would not require vigorous treatment during last two years, but [he] had relapse of symptoms at this time because of possible involvement with substance abuse ... a few days prior to admission. He was, however, reasonably cooperative with treatment, and agreed to take a combination of antipsychotic and mood stabilizers. Medication was started with Zyprexa and Depakote.... Within a few days, his condition bec[a]me quite stable, and he started talking about his plans for the future.... At the time of discharge, his condition is well-stabilized, and the patient was reasonably stable. He did not display any management problem in the hospital. He did not display any side effects from the medication....

(Tr. 198). Plaintiff was prescribed three medications at discharge: Zyprexa, Cogentin, and Depakote. His then-current GAF[3] was assessed at 50 (Tr. 199), referring to a person with "serious symptoms ... or any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)...." Diagnostic and Statistical Manual of Mental Disorders, 4th ed., Text Revision at p. 34 (DSM-IV-TR).

Plaintiff underwent inpatient psychiatric hospitalization in April 2002 for ten days. (Tr. 214-25). His symptoms had decompensated and he was becoming more delusional and was exhibiting bizarre behavior and delusional thoughts. (Tr. 215). A report noted he was "very delusional" but did not have auditory or visual hallucinations, and he was

---

[3] GAF or Global Assessment Functioning is a tool used by health-care professionals to assess a person's psychological, social, and occupational functioning on a hypothetical continuum of mental illness. It is, in general, a snapshot of a person's "overall psychological functioning" at or near the time of the evaluation. *See Martin v. Commissioner*, 61 Fed.Appx. 191, 194 n.2 (6th Cir. 2003); *see also* DSM-IV-TR at pp. 32-34.

neither suicidal or homicidal. (Tr. 215-16). Upon adjustment of his medications, "[h]e did begin to show some improvement, less disorganization in his thought processes. He appeared to be doing well ... he showed better thought organization, decreased ... disorganization of thoughts overall, no auditory or visual hallucinations, no frank delusions, mood was stable." (Tr. 216). His principal diagnosis on discharge was bipolar mood disorder, most recent episode was manic with psychotic features. (Tr. 215). His GAF was 55, *id*., referring to "moderate symptoms ... or moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers)." DSM-IV-TR at p. 34. He was prescribed Zyprexa and Depakote and was referred TCN Behavioral Services for follow-up treatment. (Tr. 215).

In October 2003 Plaintiff was involved in a motor vehicle collision when the tractor-trailer he was driving ran into another tractor trailer. (Tr. 265). He fractured some ribs and had some soft tissue injury in his right ankle, but did not suffer any long-lasting physical effects. (Tr. 265-66).

On October 26, 2003, about one week after the accident, Plaintiff was taken to the hospital emergency room due mood changes and was diagnosed on admission with "Acute psychosis." (Tr. 286). He "was somewhat disoriented, disorganized, with racing thoughts," and he reported that he had not taken his medication for several days. (Tr. 283). He was admitted to psychiatric inpatient hospitalization and treated him with Depakote and Zyprexa. he was discharged several days after admission in stable condition with referral to TCN for follow-up treatment. (Tr. 283-84).

Plaintiff was evaluated at TCN on November 6, 2003 by David Simpson, M.S., who observed that Plaintiff seemed unaware of his reaction to stress, but he appeared to decompensate drastically with stress. (Tr. 431). On mental status examination, Plaintiff was unkempt and mistrustful. His thoughts were logical but circumstantial and racing at times. (Tr. 434).

Two weeks later Plaintiff began treatment with a psychiatric nurse practitioner,

Cynthia Van Ausdal, RN, MSN, CNS. Ms. Van Ausdal's initial psychiatric assessment noted that Plaintiff's thoughts were disorganized and loose, and he was unable to provide background information. (Tr. 421). Ms. Van Ausdal observed that his affect was constricted, and his mood was irritated. His speech was loud with word sounds associations (clang associations). He showed some paranoia and was easily distracted and difficult to redirect. Ms. Van Ausdal thought that Plaintiff's judgment and insight were poor. (Tr. 422). And she noted that Plaintiff was reluctant to adhere to a medication regimen due to poor insight into his mental illness. Ms. Van Ausdal diagnosed a schizoaffective disorder and assigned a GAF of 55. She continued him on Depakote and Abilify. (Tr. 423).

In January 2004 Plaintiff's sister, Ms. Turnbloom, completed a report at the request of the Ohio Bureau of Disability Determinations (Ohio BDD). (Tr. 157-64). Ms. Turnbloom indicated that Plaintiff was frequently awake early, pacing the house. She noted he followed her around the horse stables while voicing rambling thoughts about past and present events with no particular order or meaning. (Tr. 157). She also noted that if she did not take Plaintiff to work with her, he would sleep most of the day. (Tr. 158). She stated that Plaintiff needed reminders to bathe and occasional reminders to put on clean clothes. She managed his medications by putting them in a weekly/daily dose pillbox. (Tr. 159).

Ms. Turnbloom further reported in January 2004 that Plaintiff could only perform household chores if he were under constant supervision. She did not have the time to watch him to make sure he did things right. She had to help Plaintiff pick out more nutritional items at the grocery store rather than his usual junk food. (Tr. 160). On some days, according to Ms. Turnbloom, Plaintiff could think logically; other days he could not count to five. (Tr. 161). He continued to jump from one thing to another rather than finishing what he started, and he had a short attention span. (Tr. 162). Ms. Turnbloom noted that stress caused Plaintiff to become angry and frustrated. When he experienced

6

stress, he would also become anxious, panic, and start talking more rapidly and making less sense. (Tr. 163).

The Ohio Bureau of Disability Determinations (Ohio BDD) sent Plaintiff for a consultative examination with psychologist George O. Schulz, Ph.D. in May 2004.[4] (Tr. 287-94). On mental status examination there was no indication of rambling speech. Plaintiff's affect was appropriate and congruent, and his motor activity was calm. He could only recall two of three objects after five minutes. (Tr. 291). Dr. Schulz diagnosed a schizoaffective disorder and personality disorder and assigned a GAF of 58 (Tr. 292), referring to "moderate symptoms ... or moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers)." DSM-IV-TR at p. 34.

Considering Plaintiff's ability to perform mental work activities in four areas, Dr. Schulz opined as follows:

1. <u>The claimant's mental ability to relate to others, including fellow workers and supervisors</u> – is minimally impaired. Although he reported past difficulties with bosses, he is able to relate sufficiently to coworkers on simple and moderate repetitive tasks.....

2. <u>The claimant's ability to understand, remember, and follow instructions</u> – is minimally impaired. He is capable of comprehending and completing simple and moderate routine ADL (activities of daily living) both at home and in the community or on a job setting....

3. <u>The claimant's ability to maintain attention, concentration, to perform simple repetitive tasks with adequate pace and perseverance</u> – is minimally impaired. He demonstrated minimal problems with attention or concentration during today's clinical interview. His pace and persistence were appropriate for most clinical interactions.... His attention/concentration is retained for at least the simple to moderate task range during the course of today's evaluation.

---

[4] This was the second time Dr. Schulz evaluated Plaintiff. He had previously examined Plaintiff in August 2002 in connection with his first DIB application. (Tr. 226-32).

7

> 4. <u>The claimant's mental ability to withstand the stress and pressures associated with day-to-day work activity</u> – is moderately impaired. He shows moderate mental limitations in his ability to manage stress associated with relating to others or handling stress related to carrying out work related tasks with adequate pace and perseverance particularly over a prolonged period of time including an 8 hour day or a 5 day work week.

(Tr. 293-94).

In July 2004 a psychologist reviewed the file for the Ohio BDD opining that Plaintiff was not significantly limited in his ability to perform nearly all mental work activities, and was not markedly limited in any of the mental work activities. (Tr. 295-98).

Another psychologist reviewed the file on November 3, 2004. She felt that Plaintiff's psychotic symptoms had stabilized and noted that treatment record indicated he was looking for work. (Tr. 310). This psychologist opined, "he appears capable of simple, routine tasks, relating to others superficially, and persisting for reasonable intervals at work. *Id*. She also believed that Plaintiff was "capable of persisting if work does not feature frequent changes in routine and if it does not require strict time or production demands." *Id*.

In October 2004 Plaintiff began receiving services from a community support specialist at TCN, who held a Bachelor of Arts degree. (Tr. 383). In early November 2004, the specialist met with him to help him complete paperwork for his Social Security appeal. The community support specialist noted that Plaintiff was pleasant but he smelled of body odor and was wearing the same clothes he had worn five days earlier. (Tr. 381).

In January 2005 Ms. Van Ausdal completed a psychological update indicating that Plaintiff was stable on his current medications but his condition was unpredictable. She also wrote, "Currently he desires employment but he may have to have [a] job with [decreased] stress to [decrease] risk of agitation/mood irritability/thought disorganization." (Tr. 181). Ms. Van Ausdal opined that Plaintiff was stable enough for part-time job placement. Id.

The next several months of treatment Ms. Van Ausdal at TCN focused on on helping Plaintiff obtain vocational services. (Tr. 360-76). In April 2005, Plaintiff obtained a job placement through Greene, Inc., which provided him with a work adjustment period and a job coach. (Tr. 181-93). He went to work part-time as a dishwasher at Bob Evan beginning April 25, 2005. Soon thereafter, by June 2005, Ms. Van Ausdal observed that Plaintiff was more depressed, and he felt there was "more to life than being a dishwasher." (Tr. 350). On examination his affect was blunted and he was easily irritated. His speech was slow and soft-spoken. He felt lonely since he had to move out on his own. *Id.*

On the job at Bob Evans, the job coach was discontinued after 90 days, that is, on or about July 25, 2005. (Tr. 188-89). Plaintiff lost his job by the end of July 2005. (Tr. 81A, 196). During the ALJ's hearing, he testified that he was fired because of a "failure to follow procedure," that is, he did not check with the manager before he left one day. (Tr. 557). During the 90-day period he worked, Plaintiff had 4 absences, during 2 of which he did not call in to report his absence. He also left early 2 days and did not check in with a manager another day before he left work. (Tr. 189).

In June 2005 Ms. Van Ausdal answered written interrogatories diagnosing Plaintiff schizoaffective disorder, bipolar type. (Tr. 328). She believed that Plaintiff would not be prompt and regular in his work attendance because he had displayed difficulties getting out of bed, was having problems with motivation, and exhibited irritability with those who try to prompt him. (Tr. 330). Ms. Van Ausdal thought Plaintiff was unable to respond appropriately to supervision, co-workers, and customary work pressures because he was easily frustrated, did not tolerate stress, and his mind races. *Id.* She similarly opined, with a supporting explanation, that Plaintiff was unable to perform in each remaining category of mental work activity. (Tr. 331-35), and she indicated that he had "marked" restriction in each area of daily activity. (Tr. 335-36).

Also in June 2005 mental health counselor Mr. Simpson answered interrogatories,

9

finding Plaintiff restricted in similar ways to those described by Ms. Van Ausdal. (Tr. 317-26). Mr. Simpson also wrote a letter stating that when Plaintiff went to live with his sister after the November 2003 truck accident, "he continued to decompensate, demonstrating loose associations of thoughts, irritability, inability to sleep, excessive behaviors, repeating meaningless phrases or noises/sounds heard for no reason, oddity in gait, no insight and poor judgment, begging family for help, mouth hanging open, all culminating in the need to be strapped down in Greene Memorial Hospital to be stabilized." (Tr. 316). Mr. Simpson continued:

> Since this episode, Kevin began counseling and medication therapy which he responded to by going into a depressed state, no energy, sleeping all day, no motivation, and feelings of hopelessness. While this has improved some, it still has not alleviated.
>
> Since this individual had the onset of symptoms by late adolescence and the pattern has continued, it seems very likely there is a strong genetic link involved in this condition making the prognosis below average and the expectations of continuing periods of decompensation in the future.

*Id*.

The administrative record also contains treatment notes from 2005 and into 2006 indicating, in part, that Plaintiff continued to receive at TCN. (Tr. 467-534).

### III.  ADMINISTRATIVE REVIEW

#### A.  **"Disability" Defined and the Sequential Evaluation**

The definition of the term "disability" is essentially the same for both DIB and SSI. *See Bowen v. City of New York*, 476 U.S. 467, 469-70 (1986). Narrowed to its statutory meaning, a "disability" includes only physical or mental impairments that are both "medically determinable" and severe enough to prevent the applicant from (1) performing his or her past job and (2) engaging in "substantial gainful activity" that is available in the regional or national economies. *See Bowen*, 476 U.S. at 469-70 (1986). A DIB/SSI applicant bears the ultimate burden of establishing that he or she is under a

disability.  *See Key v. Callahan*, 109 F.3d 270, 274 (6th Cir. 1997); *see Wyatt v. Secretary of Health and Human Services*, 974 F.2d 680, 683 (6th Cir. 1992); *see also Hephner v. Mathews*, 574 F.2d 359, 361 (6th Cir. 1978).

Social Security Regulations require ALJs to resolve a disability claim through a five-Step sequential evaluation of the evidence.  *See* Tr. 23-31; *see also* 20 C.F.R. §§404.1520(a)(4), 416.920(a)(4).[5]  Although a dispositive finding at any Step terminates the ALJ's review, *see also Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007), if fully considered, the evaluation answers five questions:

1. Has the claimant engaged in substantial gainful activity?

2. Does the claimant suffer from one or more severe impairments?

3. Do the claimant's severe impairments, alone or in combination, meet or equal the criteria of an impairment set forth in the Commissioner's Listing of Impairments (the Listings), 20 C.F.R. Subpart P, Appendix 1?

4. Considering the claimant's residual functional capacity, can the claimant perform his or her past relevant work?

5. Considering the claimant's age, education, past work experience, and residual functional capacity, can the claimant perform other work available in the national economy?

*See* 20 C.F.R. §416.920(a)(4); *see also Colvin*, 475 F.3d at 730; *Foster v. Halter*, 279 F.3d 348, 354 (6th Cir. 2001).

### B. The ALJ's Decision

ALJ Shell conducted required five-step sequential evaluation, concluding as follows:

Step 1:   Plaintiff had not engaged in any substantial gainful activities since his claimed disability onset date of October 21, 2003.

---

[5] The remaining citations will identify the pertinent SSI Regulations with full knowledge of the corresponding DIB Regulations.

11

Step 2: Plaintiff suffered from the severe impairment of schizoaffective disorder, bipolar type.

Step 3: Plaintiff did not have an impairment or combination of impairment that met or equaled the criteria of the Listings.

Step 4: The ALJ assessed Plaintiff's Residual Functional Capacity as follows:

> After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform work at all exertional levels, but is limited to low stress jobs. Low stress is defined as not involving direct dealing with the public, production quotas, or over the shoulder supervision.

Step 4: Plaintiff could not perform his past relevant work.

Step 5: Plaintiff could perform a significant number of jobs existing in the national economy.

As a result of the ALJ's findings throughout the sequential evaluation, he concluded that Plaintiff was not under a disability and not eligible for DIB. (Tr. 15-25).

## IV. JUDICIAL REVIEW

Judicial review of an ALJ's decision determines whether substantial evidence in the administrative record supports the ALJ's factual findings. *Bowen v. Comm'r. of Soc. Sec.*, 478 F.3d 742, 745-46 (6th Cir. 2007). "Substantial evidence is defined as 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Bowen*, 478 F3d at 746 (citing in part *Richardson v. Perales*, 402 U.S. 389, 401 (1977)). It consists of "more than a scintilla of evidence but less than a preponderance..." *Rogers v. Comm'r. of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007). Judicial review for substantial evidence is deferential not *de novo*. *See Cruse v. Commissioner of Social Sec.* 502 F.3d 532, 540 (6th Cir. 2007); *see also Cutlip v. Secretary of Health and Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994). The Court's agreement or disagreement with the ALJ's findings plays no role in the substantial

evidence review, and no significance attaches to contrary evidence in the record – if other substantial evidence supports the ALJ's findings. *Rogers*, 486 F.3d at 241; *see Her v. Comm'r. of Soc. Sec.*, 203 F.3d 388, 389-90 (6th Cir. 1999).

Reviewing for substantial supporting evidence is not the stopping point of judicial analysis. Courts also examine the administrative decision to determine whether the ALJ applied the correct legal criteria. *See Bowen*, 478 F.3d at 746. If the ALJ did not, the decision may not be upheld even when substantial evidence supports the ALJ's findings. *See id.* For example, a decision will not be upheld where the ALJ failed to apply the standards mandated by the Social Security Regulations and where that failure prejudices a claimant on the merits or deprives the claimant of a substantial right. *See Bowen*, 478 F.3d at 746 (and cases cited therein). Through *Bowen* and other recent Sixth Circuit cases, an ALJ's failure to apply the correct legal criteria – at least when evaluating medical source opinions – mandates further judicial review for harmless error. *Bass II v. McMahon*, 499 F.3d 506, 512 (6th Cir. 2007); *see Bowen*, 478 F.3d at 747-49; *see also Wilson*, 378 F.3d at 547-49 (offering examples of possible *de minimis* errors). Consequently, if the ALJ erred by not applying the correct legal criteria but the error was harmless, the decision should be affirmed. *See Bass II*, 499 F.3d at 512 (and cases cited therein).

## V. DISCUSSION

### A. The Parties' Contentions

Plaintiff summarizes the two issues he presents as follows:

> Whether the administrative law judge's finding of residual functional capacity is supported by substantial evidence as a matter of law where the administrative law judge erred in his evaluation of the opinions of Treating Psychiatric Nurse Practitioner Van Ausdal and Treating Counselor Simpson, these opinions were supported by the treatment record, and the administrative law judge failed to evaluate this opinion under the factors identified in the regulations?

13

Whether the administrative law judge's finding of residual functional capacity is supported by substantial evidence where the administrative law judge claimed to give significant weight to State agency opinion, but left out a significant limitation – a limitation to routine work – without explanation?

Answering these questions in the affirmative, Plaintiff first contends that the ALJ erred in his evaluation of the opinions provided by Ms. Van Ausdal and Mr. Simpson, and in placing greater weight on the opinions provided by Dr. Schulz. Plaintiff also contends that there is no evidence in the record that he can perform the jobs identified by the vocational expert if he is limited to simple and <u>routine</u> work.

The Commissioner argues that the ALJ provided ample, valid, and reasonable grounds for relying on Dr. Schulz's opinions and the opinions of the Ohio BDD reviewing psychologists over the opinions of Ms. Van Ausdal.

The Commissioner further argues that the ALJ's omission of routine work from his assessment of Plaintiff's Residual Functional Capacity did not constitute error because the vocational expert identified a significant number of unskilled jobs, which by definition included jobs that were simple, repetitive, and routine.

### B.  **Medical Source Opinions**

There is no treating medical source opinion in the administrative record. Instead, the record contains opinions provided by Plaintiff's treating Nurse Practitioner Ms. Van Ausdal and by Mr. Simpson. The record also contains the opinions by consultative examiner for the Ohio BDD, Dr. Schulz, and by two psychologists who reviewed the record for the Ohio BDD.

The Commissioner views non-treating medical sources "as highly qualified physicians and psychologists who are experts in the evaluation of the medical issues in disability claims under the [Social Security] Act." Social Security Ruling 96-6p, 1996 WL 374180 at *2. Yet the Regulations do not permit an ALJ to automatically accept (or reject) the opinions of a non-treating medical source. *See id*. at *2-*3. The Regulations

14

explain, "In deciding whether you are disabled, we will always consider the medical opinions in your case record together with the rest of the relevant evidence we receive." 20 C.F.R. §404.1527(b). To fulfill this promise, the Regulations require ALJs to evaluate non-treating medical source opinions under the factors set forth in §404.1527(d) including, at a minium, the factors of supportability, consistency, and specialization. *See* 20 C.F.R. §404.1572(f); *see also* Ruling 96-6p, 1996 WL 374180 at *2-*3.

    **C.**    <u>**Analysis**</u>

The opinions on which Plaintiff relied were provided by two individuals – Ms. Van Ausdal and Mr. Simpson – who are not considered to be acceptable medical sources under the Regulations. The Regulations define "acceptable medical sources" to include, for instance, licensed physicians, licensed or certified psychologists. 20 C.F.R. §404.1513(a). Neither licensed nurse practitioner nor mental health counselors are included within the definition of acceptable medical sources. *See id*.; *see also* §404.1513(d).

The opinions of such medical sources are not automatically discarded. Instead, "opinions from non-medical sources who have seen the claimant in their professional capacity should be evaluated by using the applicable factors, including how long the source has known the individual, how consistent the opinion is with other evidence, and how well the source explains the opinion." *Cruse v. Commissioner of Social Sec.*, 502 F.3d 532, 541 (6th Cir. 2007)(discussing in part Social Security Ruling 06-03p, 2006 WL 2329939).

> Although there is a distinction between what an adjudicator must consider and what the adjudicator must explain in the disability determination or decision, the adjudicator generally should explain the weight given to opinions for these 'other sources,' or otherwise ensure that the discussion of the evidence in the determination or decision allows a claimant or subsequent reviewer to follow the adjudicator's reasoning, when such opinions may have an effect on the outcome of the case.

*Cruse*, 502 F.3d at 541 (quoting Soc. Sec. Ruling 06-03P, 2006 WL 2329939 at *7).

In the present case, the ALJ considered and declined to give dispostive weigh to Ms. Van Ausdal's opinions by finding them inconsistent with the progress notes from TCN, including her own treatment notes and other substantial evidence of record. (Tr. 22-23). The ALJ explained, "Those notes are generally unremarkable with the exception that they occasionally note a depressed mood...." (Tr. 22). In this manner, the ALJ applied the correct legal criteria to his evaluation of Ms. Van Ausdal's opinions and, consequently, did not err as a matter of law. *See* 20 C.F.R. §404.1513; *see also Cruse*, 502 F.3d at 541; Soc. Sec. Ruling 06-03P, 2006 WL 2329939 at *5-*6. The issue, then, is whether substantial evidence supports the ALJ's inconsistency finding.

A review of the TCN treatment records reveals the presence of substantial evidence in support of the ALJ's finding because the notes often document that with medication, Plaintiff was largely stable and wanted to return to work. *See* Tr. 352, 360, 379, 390, 392, 398, 402, 406, 481, 485, 491, 518. His complaints were often of boredom and depression due to his inability to find a job. (Tr. 350, 469, 518, 527). Because these records were inconsistent with the opinions provided by Ms. Van Ausdal and Mr. Simpson, substantial evidence supported the ALJ's reason for rejecting their opinions.

In addition, because the ALJ's rejection of Ms. Ausdal's and Mr. Simpson's opinions was not flawed by legal error and was supported by substantial evidence, it was likewise not error for the ALJ to discount their opinions based, in part, on their status as not "acceptable medical sources" under the Regulations, and to instead place more weight on the opinions of Dr. Schulz's opinions, an acceptable medical source. Thus, contrary to Plaintiff's contentions, the ALJ did not err by recognizing, "Dr. Schulz ... is a licensed psychologist who is specifically recognized as an acceptable medical source under the regulations. While this does not mean that Ms. Van Ausdal's opinion is simply disregarded, it must be viewed in light of the minimal findings of Dr. Schulz." (Tr. 19). The ALJ, moreover, credited Dr. Schulz's opinion by finding "it well-supported by his

16

mental status observations" and by finding it supported by the record-reviewing psychologists' opinions. (Tr. 22). Because the Regulations required the ALJ to consider such factors, the ALJ applied the correct legal criteria to Dr. Schulz's opinions. *See* 20 C.F.R. §404.1527(3)-(5). And a review of Dr. Schulz's opinion reveals that he in fact explained what observations he made and why he believed that Plaintiff had only minimal or moderate limitations in his mental work activities. *See* Tr. 290-93. Substantial evidence therefore supports the ALJ's reasons for crediting Dr. Schulz's opinions.

Plaintiff contends that the ALJ revealed his misunderstanding of Plaintiff's mental impairment by noting that Plaintiff lost his job because of performance and attendance issues, rather than due to his mental impairments. Plaintiff reasons, "As is made clear by the reports of Ms. Van Ausdal and [Plaintiff], it is exactly because of his mental impairment that [Plaintiff] has problems with attendance and performance." (Doc. #9 at 18). This contention fails to show error in the ALJ's decision because the ALJ did not err either by rejecting Ms. Van Ausdal's opinions or by relying on Dr. Schulz's opinions. In addition, the ALJ did not misunderstand the evidence tending to show that Plaintiff was stable when taking medication, and rather than misunderstanding Plaintiff's performance and attendance problems, the ALJ properly relied on Dr. Schulz's opinions that Plaintiff had merely minimal or moderate impairments in his ability to perform mental work activities.

Plaintiff lastly argues that ALJ erred when assessing Plaintiff's Residual Functional Capacity by failing to limit him to routine work. The Commissioner has the better argument here, however, because the Vocational Expert based his identification of a significant number of jobs available to someone who is limited to unskilled work, *see* Tr. 562-63, because unskilled work consists in part of routine work. As the Court of Appeals concluded in *Allison v. Apfel*, unpublished op., 2000 WL 1276950 at *4 (6th Cir. 2000), "We believe that the ALJ's qualification that Allison was limited to simple, repetitive, and routine tasks, with the category of light work, simply means that Allison is

limited to unskilled light work."

Accordingly, Plaintiff's Statement of Errors lacks merit.

## IT IS THEREFORE RECOMMENDED THAT:

1. The Commissioner's final non-disability decision be affirmed; and

2. The case be terminated on the docket of this Court.


July 20, 2009                          s/Sharon L. Ovington
                                                 Sharon L. Ovington
                                      United States Magistrate Judge

## NOTICE REGARDING OBJECTIONS

Pursuant to Fed. R. Civ. P. 72(b), any party may serve and file specific, written objections to the proposed findings and recommendations within ten days after being served with this Report and Recommendations. Pursuant to Fed. R. Civ. P. 6(e), this period is extended to thirteen days (excluding intervening Saturdays, Sundays, and legal holidays) because this Report is being served by mail. Such objections shall specify the portions of the Report objected to and shall be accompanied by a memorandum of law in support of the objections. If the Report and Recommendations are based in whole or in part upon matters occurring of record at an oral hearing, the objecting party shall promptly arrange for the transcription of the record, or such portions of it as all parties may agree upon or the Magistrate Judge deems sufficient, unless the assigned District Judge otherwise directs. A party may respond to another party's objections within ten days after being served with a copy thereof.

Failure to make objections in accordance with this procedure may forfeit rights on appeal. *See United States v. Walters,* 638 F.2d 947 (6th Cir. 1981); *Thomas v. Am,* 474 U.S. 140 (1985).